In re Jerome SAYLER, Margaret Elaine Sayler, Debtors.

In re The PEOPLES STATE BANK AND TRUST COMPANY, Plaintiff,

v.

Jerome SAYLER, Margaret Elaine Sayler and Lynn D. Allison, Trustee, Defendants.

Bankruptcy No. 85–11742.
Adv. No. 86–0024.

United States Bankruptcy Court, D. Kansas.

Aug. 22, 1988.

Ernest McRae, McRae & Early, Wichita, Kan., for debtors.

Mark D. Calcara, Watkins, Calcara & Rondeau, Great Bend, Kan., for American State Bank.

Lynn D. Allison, Wichita, Kan., trustee.

Greg L. Bauer, McPherson, Bauer, Pike & Pike, Great Bend, Kan., for the Peoples State Bank & Trust Co.

## MEMORANDUM OF DECISION

JOHN K. PEARSON, Bankruptcy Judge.

This matter is again before the Court for a decision on the objection of a creditor and the trustee to the debtor, Jerome Sayler's claim of exemption to a group of life insurance policies purchased shortly before the filing of the petition for relief in bankruptcy. The American State Bank of Great Bend, Kansas (hereinafter "ASB" or "the Bank") and the trustee each filed a timely objection to Jerome Sayler's claim in the life insurance policies. For the sake of ease, Jerome Sayler will be referred to as "the debtor" hereafter. Margaret Elaine Sayler is no longer involved in these proceedings although she is a "debtor" in the bankruptcy case. The debtor appears by Ernest McRae of McRae & Early, Wichita, Kansas. The Bank appears by Mark D. Calcara of Watkins, Calcara & Rondeau, P.A., Great Bend, Kansas. The trustee, Lynn D. Allison, appears personally.

The Peoples State Bank and Trust Company of Ellinwood, Kansas (hereinafter "PSB") filed an objection to the debtor's discharge. The objection to discharge and the objection to the life insurance policies were tried together in August of 1986. At the conclusion of the trial the Court overruled the objection to discharge and took the exemption issue under advisement. On October 10, 1986 this Court entered a detailed memorandum of decision setting out extensive findings of fact and conclusions of law. *In re Sayler*, 68 B.R. 111 (Bankr. D.Kan.1986). That decision was timely appealed to the District Court which, by order entered June 23, 1987 reversed and remanded stating:

This court is not in a position to reweigh the evidence. Therefore the case will be remanded to the bankruptcy court, where the court is to make findings of fact as to each of the "badges of fraud" set forth in *Mueller*. [*In re Mueller*, 71 B.R. 165 (D.C.D.Kan.1987).] The court must then determine whether the Saylers' circumstances give rise to clear and convincing evidence of fraud. If—and only if—the court finds an intent to defraud by clear and convincing evidence, it may sustain the objections to the debtors' claimed exemptions of the life insurance policies.

*In re Sayler*, 98 B.R. 536 (D.C.D.Kan.1987) (Kelly, J.) (hereafter "the District Court

order"). No appeal was taken from the District Court order.

Pending a determination of an appeal of the District Court's order in *In re Mueller* referred to above, this Court has held the case under advisement since the District Court ruling of reversal.[1] Given the posture of the case, this Court will discuss the legal analysis required before making the findings of fact required by the District Court in its order of remand. As so often is the case in bankruptcy matters, this Court is required to make findings of fact concerning the intent of the parties in taking action affecting the assets of their bankruptcy estate. Because actions often speak more clearly than words, the courts have generally developed checklists or criteria which should be considered in making determinations of intent. Generally, the trier of fact may ignore the pious protestations of innocent intent of the parties affected by the outcome when their actions demonstrate a contrary intent. *In re Liming*, 797 F.2d 895 (10th Cir.1986).

■ In its order the District Court held that the life insurance policies in Kansas are not per se entitled to state law exemption and in fact are not exempt if the debtor has a fraudulent intent in acquiring them. It went on to approve, in slightly modified form, the criteria or checklist said to evidence intent to defraud set out in *Matter of Mehrer*, 2 B.R. 309 (Bankr.E.D. Wash.1980). The necessary fraudulent intent may be ascertained by considering: (1) whether there was a fair consideration paid for the life insurance policy; (2) whether the debtor was solvent or insolvent as a result of the transfer or whether he was insolvent at the time of the transfer; (3) the amount of the policy; (4) whether the debtor intended, in good faith, to provide by moderate premiums some protection to those to whom he had a duty to support; (5) the length of time between the purchasing of a life insurance policy and the filing of the bankruptcy; (6) the amount of nonexempt property which the debtor had after purchasing the life insurance policy; and (7) the debtor's failure to produce available evidence and to testify with significant preciseness as to the pertinent details of his activities shortly before filing the bankruptcy petition.

*In re Mueller, supra* at 168, cited in the District Court order at 9–10. While not all items on the checklist must be present, there must be sufficient indicia of fraud to rise to the level of clear and convincing evidence. *In re Mueller, supra*, at 169; District Court order at 10.

■ Generally, as the District Court noted, simply transferring nonexempt assets to exempt status is not a basis for a creditor's objection to the exemption. The District Court order does not state clearly that a dishonest or fraudulent motive is necessary, but rather states that the necessary intent to defraud is discerned by the application of the *Mehrer* criteria.[2] Whether the intent necessary is a dishonest one or something less, this Court concludes that, upon application of the *Mehrer* criteria mandated by the District Court, the Bank and the trustee have demonstrated by clear and convincing evidence that the debtor, Jerome Sayler, intended to defraud one or more of his creditors by transferring the funds from the ERISA account to the life insurance policies at issue.

The sole issue before this Court is the debtor's intent in withdrawing certain funds from two ERISA qualified pension plans ("the ERISA accounts") and purchasing certain life insurance policies challenged by the Bank and the trustee. The remaining facts are not seriously disputed

---

1. This Court questions whether remand is proper here where the District Court finds the legal analysis inadequate to support this Court's findings of fact. However, no appeal has been taken from the order of remand.

2. The difficulty with the District Court ruling is that it seems to focus on some improper motive or dishonest design on the part of the debtor rather than on the recovery of improperly transferred assets which the wording of the statute suggests only the state legislature is in a position, within the limits of the state Constitution to restrict the availability of an exemption created by state statute and allow recovery of any transfer or conversion to insurance. *Compare* 11 U.S.C. § 548.

and are set out in great detail in both this Court's prior order and the District Court's order. They may be summarized as follows:

The debtor, Jerome Sayler, is a medical doctor, practicing in and near Great Bend, Kansas, and at all relevant times was a principal and stockholder in an entity called "Central Kansas Pathological Associates Chartered." In 1985 he was the beneficiary and a designated trustee of two ERISA qualified plans or accounts. On June 1, 1985, pursuant to the terms of the plans, the debtor withdrew all of his vested benefits in the ERISA accounts, totaling approximately $585,000.00. At that time two lawsuits were pending against him for collection of debts that he owed to PSB and another bank with claimed damages of over $850,000.00. The debtor was hopelessly insolvent under either test of insolvency in that his liabilities substantially exceeded his assets. Furthermore he was generally not paying his obligations as they came due. As of June 1, 1985 the debtor was the owner of and insured under eleven term and whole life insurance policies with a total cash value of approximately $291,649.53 and with a face value of $1.19 million dollars. Included in those figures are two policies issued by U.S.F. & G. which the debtor had originally taken out in 1978 and which were required to be converted to whole life at or prior to the time the debtor reached the age of sixty-five. Because he reached that age in July of 1985, the debtor paid approximately $26,000.00 to convert the policies to whole life in May of 1985. The debtor was able, at trial, to account for approximately $535,000.00 of the proceeds withdrawn from the ERISA accounts. He used the proceeds to pay approximately $212,000.00 in taxes on the lump sum distribution of the ERISA funds; pay off the mortgage on his home; remodel the home; purchase two new automobiles and various household goods; pay various legal and accounting fees; pay off certain existing loans on insurance policies and at a bank; to cover the premiums necessary to convert the U.S.F. & G. term policies; and to purchase the Universal Life policy issued by Southwestern Life Insurance Company.

The Southwestern Life Insurance Company policies had a face amount of $350,000.00 and a cash value of approximately $166,000.00. The debtor's wife, Margaret Sayler, was the beneficiary under the new insurance policy. According to the testimony before this Court, the insurance policy would return not only its accumulated cash value, approximately $166,000.00, but also the face amount of the policy on the debtor's death.

The debtor's petition for relief was filed on September 18, 1985. Although the District Court stated that the petition for relief was filed approximately five and one-half months after the issue of the Southwestern Life Insurance Company policy, in fact the premiums on that policy were paid on July 12 and July 29, 1985 in the amount of $175,000.00 and the policy was not issued until receipt of the second installment payment. While the District Court's order suggests that the debtor was using the life insurance policies to shelter the ERISA funds from immediate tax liability, this is not the case. The debtor paid approximately $212,000.00 in taxes on the lump sum distribution of the ERISA funds and, in fact, overpaid his tax liability on the withdrawal thereof. The trustee has recovered approximately $50,000.00 through the filing of an amended tax return which is included in the funds held by the trustee at this time.

This Court held that the conversion of the existing term policies, even though U.S. F. & G. had first issued the term policies in 1978, constituted the issuance of a new policy within one year of the filing of the bankruptcy within the applicable Kansas statute. The District Court affirmed that ruling and no appeal was taken.

The question before the Court then is whether the U.S.F. & G. policies and the Southwestern Life Insurance policy were obtained by the debtor for the purpose of defrauding one or more of the debtor's creditors. *See* K.S.A. 40–414(b)(1) (1984). It is absolutely clear that the debtor purchased the three policies in issue within one year of the date of the bankruptcy petition on September 18, 1985. The sole question

is whether the policies were obtained with intent to defraud one or more of debtor's creditors. The District Court has directed that this Court apply the *Mehrer* criteria in determining that intent.

The first criterion is whether there was a fair consideration paid for the life insurance policies. There are in fact three policies involved: the two terms policies which were converted by U.S.F. & G. in May of 1985 and the new policy issued in July of 1985 by Southwestern Life Insurance Company. The two term policies converted in May cost approximately $26,000.00 and have face value amounts of $100,000.00 each. The policy issued in July of 1985 cost $175,000.00 and has a face value of $350,000.00. As noted above, the District Court was apparently under the impression that all of the policies were issued five and one-half months before the petition for relief was filed in September. In fact the larger Southwestern Life Insurance policy was issued in late July 1985, approximately six weeks before the debtor filed his petition. There is no basis for concluding that the debtor overpaid for the coverage issued. By his own testimony and by the Court's observation, the debtor is in poor health and, at age sixty-five, was being forced to convert certain term policies which expired upon his reaching that age. The first criterion is neutral or in the debtor's favor as there is no evidence that the debtor paid more than necessary for the policies. Had he paid more than face amount for the policies this criterion might weigh against the debtor.

The second factor for consideration is whether the debtor was solvent or insolvent as a result of the transfer or whether he was insolvent at the time of the transfer, i.e., the purchase of the life insurance policies. This Court found, and the District Court agreed, that on either a balance sheet or equity test basis, the debtor was hopelessly insolvent at the time of the purchase of the life insurance policies. The transformation of the ERISA funds into the life insurance policies took place while the debtor was involved in several state court suits and just after a Chapter 11 case before this Court failed to revive the debtor's farming operation.

One of the state court cases placed in doubt the debtor's ability to claim the ERISA funds as exempt under the existing caselaw in Kansas. It is perhaps here that the necessary and proper intent is evident: had the debtor left the funds in the ERISA account they would have been exempt under the existing caselaw in this District at that time, but subject to the potential claim of the American State Bank by virtue of the pending state lawsuit. In withdrawing the funds and purchasing the life insurance policy, the debtor was clearly attempting to avoid the claim of at least one creditor to those assets. Those facts certainly suggest some motive other than simply bankruptcy estate planning. In any event the debtor was hopelessly insolvent and had virtually no remaining nonexempt unencumbered assets for the payment of his debts. This factor strongly supports a conclusion that the debtor's intent was improper.

The third factor for consideration under *Mehrer* is the amount of the policy or policies. This must be considered with the fourth factor of the septet, namely whether the debtor intended in good faith to provide by moderate premiums some protection for those to whom he had a duty of support. The debtor at the time was approaching age sixty-five and had no dependents other than his wife. At the relevant times he had in force $990,000.00 in face amount of life insurance with a total cash value of approximately $266,000.00. Those figures do not include the challenged policies issued by U.S.F. & G. and Southwestern Life. The existing policies have been claimed as exempt and were not challenged by the creditors or the trustee. One of the policies had been cashed in and the cash value withdrawn and used by the debtor.

At the time of trial there was no showing by the debtor that upon his demise he had to provide the rather extraordinary sums his existing policies would pay to his surviving spouse. There was no testimony that she required extraordinary care or income which she would not have in the

event of his death. The debtor purchased the challenged policies which have face values totaling approximately $550,000.00 in cash values as of the time of trial of approximately $210,000.00. According to the testimony, the death benefits payable to the beneficiary, Margaret Sayler, would actually equal the face amount of the policies plus the cash values. Thus the debtor added another $770,000.00 to his existing $990,000.00 in life insurance. On the eve of bankruptcy and while insolvent the debtor virtually doubled his life insurance coverage at a time when there was no showing that the additional coverage was necessary to provide his sole dependent support in the event of his death. Indeed the debtor testified that he considered the tax sheltered nature of the income on the cash values of an investment a factor in his decision.

The *Mehrer* factors suggest that while a debtor may have a duty to provide for his dependents in the event of his death, the amount of the insurance and the cost must be moderate. Under the circumstances the Court concludes that the debtor's primary purpose in purchasing the insurance policies was not to provide a reasonable amount of insurance at a moderate premium to those dependent upon him for support, but an intent to improperly remove the ERISA funds from under the claims of ASB.

The fifth criteria in the *Mehrer* septet requires this Court to examine the length of time passing between the purchase of the life insurance policy and the filing of the bankruptcy petition. Again, an examination of the time frame here suggests that the debtor had an improper motive in purchasing the life insurance on the eve of his bankruptcy petition. The suggestion in *Mehrer* is that the shorter the time frame between the purchase of the insurance and the filing of the bankruptcy petition, the more likelihood the improper intent is involved. In *In re Mueller, supra,* the District Court upheld this Court's ruling that a policy purchased on the very eve of bankruptcy—within four or five days of the filing of the petition for relief—suggested an improper motive. The amount involved in *Mueller* was approximately $7,500.00.

The debtor had purchased the policy after consulting with bankruptcy counsel and received the policy from the same insurance salesman that testified before this Court in this case. There was extensive testimony in this case concerning the advice that the debtor received, not only from the insurance agent (who is also a lawyer), but also from his bankruptcy counsel who represented him before this Court. The debtor was fully and carefully advised and made a conscious decision to purchase life insurance with the withdrawn ERISA funds. The purchase of the insurance with literally the last remaining unencumbered nonexempt assets less than seven weeks before the filing of the bankruptcy petition, strongly suggests an improper motive. The legislature has provided that the purchase of a policy more than one year prior to the filing of a bankruptcy petition insulates the policy from the claims of creditors. Here again the length of time suggests very strongly an improper motive.

This is particularly true in considering the penultimate criteria of the *Mehrer* septet, namely the amount of the nonexempt property which the debtor had after purchasing life insurance policies. It would appear that the debtor used his last nonexempt, unencumbered asset to purchase the life insurance policies before the Court. As in *Mueller, supra,* and as mentioned above, the debtor purchased the life insurance with literally his last nonexempt, unencumbered asset. In its prior opinion this Court declined to follow an old line of Kansas cases which suggested that the transfer of assets to a relative leaving no assets to satisfy creditors' was fraudulent per se. Under all circumstances, however, the transfer of the debtor's last unencumbered asset strongly suggests an improper motive.

The final criterion in the *Mehrer* septet requires that the Court consider the debtor's failure to produce available evidence and to testify with significant preciseness as to the pertinent details of his activity shortly before the filing of the bankruptcy petition. Exactly what is meant by this is unclear from a review of the *Mehrer* deci-

sion or the District Court's adoption thereof. The Court notes, however, that in this case the debtor was able to testify concerning the use of only $535,000.00 of the $585,000.00 in proceeds from the ERISA accounts. The debtor was not able to testify with great precision as to the nonexempt assets that he did purchase or the use of all of the funds. On the other hand, the debtor was able to testify in great detail about his contacts with counsel and with his insurance agent and their general discussions concerning the various purchases he made on the eve of bankruptcy. At worst the debtor's testimony suggests that he was under some pressure to seek the shelter of this Court and could not account in any great detail for the funds dealt with on the eve of bankruptcy. The Court concludes that, again, the final factor of the *Mehrer* criteria really does not clearly or convincingly suggest an improper motive.

All things considered, however, the Court is satisfied that the objecting parties have, by clear and convincing evidence, shown that under the *Mehrer* criterion the debtor improperly intended to defraud his creditors by placing the ERISA funds in the life insurance policies.

Accordingly, the objection to the exemption of the cash values two U.S.F. & G. policies issued in May of 1985 to the debtor and to the exemption of cash value of the Southwestern Life Insurance policy issued in July of 1985 is sustained.

The foregoing constitutes findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) and Fed.R.Bankr.P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.